Gkeen, J.,
delivered the opinion of the court.
This bill is brought to recover several negro slaves which the complainant claims title to by virtue of a bill of sale *362 to him from John Savage, for a negro girl, Nancy, who is the mother of the other negroes.
It appears from proof in the cause, that Anthony Maultsby died in North Carolina, about the year 1800, having made his will, whereby he directed, that a negro woman should be purchased with the sum of three hundred dollars, to remain with Isabella McFalter during her life, and at her death said negro and her increase to be divided among Samuel Carver, Ann Jane and Mary McFalter. The said Isabella was appointed and qualified as executrix of the will. About the year 1818 the family removed to Tennessee, then consisting of the mother, and* William A., Samuel C. and Ann Jane, her children, Mary having died soon after her father, the said testator. In 1823, the complainant, William A., went to North Carolina as agent for his mother, to collect the funds due from the estate of the said Anthony. John Savage had in his hands monies belonging to said estate, and the said William A. agreed to receive a negro girl in payment thereof, and took a bill of sale for said girl to himself. The negro was brought by him to this country, and placed in the possession of his mother, with whom her said children at that time lived. In 1829 the complainant married and went to housekeeping, leaving the negro Nancy and her children still with the family. In 1833, Isabella, the mother of complainant, died. After her death Samuel C. and Ann Jane lived together for a time, retaining possession of the negroes, and regarding themselves as owners of an interest in them. Soon after his mother’s death, Samuel C. removed to Georgia, where he has lived ever since, setting up no claim to any of these negroes. After his removal Ann Jane still continued in possession of the negroes, and in December, 1834, she conveyed the negroes by bill of sale to one Alexander, with a view to avoid their liability for the debts of her brother Samuel, who had left the country. Alexander took possession of the negroes, and re *363 tained them a few weeks, when he returned them to the possession of the said Ann Jane. She continued in possession of them until 1841, when she intermarried with G. W. C. Ed-miston, the defendant’s intestate. Edmiston continued in possession of the negroes until the death of his wife; the said Ann Jane, in April 1842.
After the death of the said Ann Jane, the complainant set up a claim to the negroes, (Nancy and her increase,) and produces in support of his claim, a paper in the following words : “Agreement made and entered into this 8th. day of April, 1834, between William A. Maultsby, of the county of Giles, and State of Tennessee, of the one part, and A. J. Maultsby, of the county and State above, of the other part, witnesseth, that whereas I, William A.Maultsby, have this day lent and delivered to the care of A. J. Maultsby four negroes, namely Nancy, Tom, Mary and Eliza, which the said A. J. Maultsby is to have the use of until called for by the said W. A. Maultsby, his heirs or assignees, by the said A. J. Maultsby paying their taxes, and all other necessary expenses. The above named negro Mary, I William A. Maultsby promise, and bind myself, my heirs, &c., that the said A. J. Maultsby shall have the service of during her life, and her bodily heirs after her, if she should have any; but if the said A. J. Maultsby should die without issue, then the said Mary and her increase, if there should be any, shall return to the said William A. Maultsby, or his heirs or assigns, &c. I, Ann Jane Maultsby, of the other part, acknowledge the delivery of the above negroes to me, and promise and bind myself, my heirs or assignees, to comply with the above article in paying taxes and all other expenses, and delivering Nancy, Tom and Eliza, when called for by the said William A. Maultsby, his heirs or assigns, and their increase, if there should be any, and Alary and her increase, if I should die without issue, shall be delivered as above, to the said William A. Maultsby, his heirs or assigns, &c. In *364 witness whereof we sign our names and fix our seals, the day and date above.
William A. Maultsby, [Seal.]
Ann Jane Maultsby, [Seal.]”
The complainant proved by Flora Lackey, that she had been acquainted with Ann Jane Maultsby from an early period of her life, that she was acquainted with her hand writing, and believed the signature of her name to the above instrument, to be in her hand writing. The witness had seen Ann Jane write about seven or eight years ago, frequently; thinks the signature to be hers, from having compared it with a piece of writing she sent witness seven or eight years ago. The witness is first cousin to the complainant.
Paschal Nolly also proves, that he was acquainted with the handwriting of Ann Jane Maultsby, and that the signature to the above instrument is in her hand writing.
This witness is discredited by some ten or twelve witnesses, who^,would not believe him upon his oath.
The complainant called twelve or fifteen witnesses who would believe Nolly on oath. He also proved by Jesse Clark, that about the year 1833, or 1834, he was employed by the complainant to get tan bark, and while at this work boarded at the Maultsby’s three or four weeks, during which time, he frequently heard Ann Jane and Samuel speak of the ownership of the negroes, and understood from them that the ne-groes belonged to William, Samuel, and Ann Jane. On one occasion he heard the old lady say, in presence of Ann Jane, that when William got fixed, the negroes would all belong to him; to which Ann made no reply. He heard Ann Jane say, that she wished her interest in the negroes, at her death, go to her brother William’s children.
It appears from the evidence that the complainant was married in 1829, and was then a poor man, and has continued very poor up to this time. Ann Jane continued in possession *365 of the negroes from the period of her mother’s death, in 1833, until her own marriage in 1841; and the complainant resided all that time in the same county, and not far distant from her; and no witness proves, that during all that time the negroes were ever spoken of as belonging to him.
When Ann Jane, in December 1834, conveyed the negroes to Alexander, she made her mark to the bill of sale. Alexander never heard of any claim set up to them by William.
The answer of the defendant denies that the instrument above set forth, was executed by Ann Jane.
Upon this statement, the first question is, whether this agreement was executed by Ann Jane Maultsby.
It must be conceded that all the circumstances connected with the transactions of the family, are against the genuineness of the instrument. There does not appear to have been any sufficient motive to have induced its execution. Ann Jane had a much larger interest in them than the complainant was entitled to. She was entitled to one-third of all the ne-groes in remainder, after the death of her mother. He was only, entitled to one-fiflh of Mary’s share, and to one-fourth of his .mother’s portion of Mary’s share. It is not probable that she would have consented to have taken a life estate in one negro only, as a full satisfaction of her interest; when her share of the negroes was worth more than the one, it is said she agreed to take for life only. Besides, the agreement concedes that the negroes were the property of the complainant, and were loaned by him to Ann Jane; when from the proof, it appears, that such was not the fact. The woman, Nancy, was purchased with money which Anthony Maultsby’s will directed, should be laid out in a negro for the use of Isabella for life, and then to go to Samuel, Ann Jane and Mary. Mary had died, and Samuel, and Anna Jane, had the negroes in possession, claiming an interest in them, after their mother’s death. Samuel’s embarrassments caused him *366 to leave the country, and abandon his interest. To prevent Samuel’s interest from being made subject to the satisfaction of his debts, Ann Jane, in December, 1834, conveyed the whole of the negroes to Alexander.
These facts clearly show, that although William had taken the title in his own name, yet that the family understood perfectly well, to whom the negroes really belonged. Knowing, therefore, the extent of her own interest in the negroes, and having become possessed of Samuel’s interest by his abandonment, it is not presumable that she would have executed an instrument, without motive, and without consideration, acknowledging the title to be in William. The execution of the bill of sale to Alexander, is a cogent circumstance against the genuineness of the agreement here set up. The deed to Alexander, is dated in December, 1834, and the agreement in question, is .dated in April of that year. Now, if in April, 1834, she had executed this paper, admitting that all the ne-groes belonged to William, what motive, or what consistency would there have been, in the execution of the bill of sale in December thereafter. That bill of sale was executed to prevent Samuel’s creditors from making them liable for his debts. But if the agreement of April be genuine, it would appear, that Samuel had no interest that could be made liable. On the other hand, this deed to Alexander, evinces that Samuel had an interest which it was feared his creditors would ascertain, and it was hoped this deed, and Alexander’s temporary possession of the negroes, would so cover, and obscure his right to any portion of them, as to deter his creditors from any attempt to make the negroes liable for his debts. It is incredible, that if, in April previously, Ann Jane had executed the agreement now set up, that she would, in nine months afterwards, have felt so much interest to secure the negroes against Samuel’s creditors.
In addition to these circumstances, the proof shows, that the *367 complainant was married in 1829, and has had a family ever since; that he has always been very poor, and much in need of help. He lived near Ann Jane until her marriage in 1841; and if this instrument had really been executed by her, he could have taken into his possession at any time all the ne-groes, except Mary, and yet he permitted her to retain them, and on her marriage, to remove them from the neighborhood without any opposition, or even so much as'the mention of the existence of his title. Such a course of conduct is contrary to our experience in relation to the actions of men, and therefore, this silence, under the circumstances, is a strong circumstance against the validity of this agreement.
The paper too is without witnesses. It is hardly probable that a party taking an obligation of this character, would have rested his means of proving it, upon the handwriting alone; and more especially, when the person executing the paper, was an illiterate woman, so little accustomed to write, as sometimes to execute instruments by making her mark. If it be supposed, that his confidence in -his sister prevented the precaution of witnesses, still, when she married, and her husband was about to remove the negroes to another county, one would think his apprehensions would have been excited, and his claim would have been made known, and he would have taken the negroes into his possession, or at least, would have demanded some further guaranty for their delivery at some future time.
With all these circumstances against the genuineness of the instrument, the mind, naturally demands very clear and satisfactory proof of the handwriting, in order to establish it as the deed of Ann Jane Maultsby. And the inquiry is, does such proof exist in this record.
Flora Lackey is a first cousin of the complainant, has seen Ann Jane write seven or eight years before she was examined ; has compared the signature with a piece of writing *368 Ann Jane sent to her, and believes the signature to this instrument to be in the handwriting of Ann Jane.
The evidence of this witness has but little force. It is the evidence of an illiterate woman, in reference to the handwriting of another woman, who wrote but little, and whose hand writing could have acquired but little uniformity; and from this fact, and the length of time since the witness saw her write, it is impossible to confide in her memory, and judgment, of the characteristics of the handwriting in ques' tion.
The only other witness to the handwriting, is Paschal Nolly. This witness is discredited by a number of witnesses. It is true, he is sustained by an equal or greater number; but, when a number of respectable persons, unprejudiced, prove that a witness is unworthy of credit, his testimony must be greatly weakened, although he may be able to bring others who would believe him.
When, therefore, we find nothing, save these two witnesses, in support of the instrument, so weak and unsatisfactory if unopposed, and on the other hand, so many circumstances against it, it is impossible for us to say that it is proved.
The ruling of the court in permitting the deposition of Henderson to be read was erroneous. This deposition was excepted to, because not filed within the time required by the rules of the court. The clerk and master allowed the exception, but on appeal to the chancellor, his decision was reversed, and the deposition was read.
. By a rule of the court, “no deposition shall be read, unless the same is filed with the clerk and master on or before the Saturday previous to the sitting of the court, as regulated by law.”
This deposition was not so filed, and we think the rule as obligatory and inflexible as a statute enacted by the Legislature. It was made by the chancellors, in pursuance of an *369 act of Assembly; and it can b~ no more disregar~d than a statute of the State. If an excuse for not filing it wexr~ offered, that would have been a sufficient reason for contituing the case, with leave to retake the deposition ; but it furnisied no authority for his Honor to disregard the rule.
In the view we take of the rights of the parties to these negroes, we should hesitate specifically to execute this agree ment, even if the proof of its genuineness were satisfactory.
We cannot perceive the slightest consideration, for the agreement on the part of Ann Jane Maultsby; and we should therefore, refuse the exercise of that discretion which exists in such cases, in favor of the complainant, and leave the parties to their remedies at law.
Reverse the decree, and dismiss the bill.